IN THE UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

PROLOGIS NA3 NV II, LLC,

     Plaintiff,                3:11-cv-00346-HDM-WGC

  vs.                     **FINDINGS OF FACT AND**
                                  **CONCLUSIONS OF LAW;**
IGT, Inc.,                   **ORDER**

     Defendant.
_____/

    This case was tried before the court sitting without a jury commencing November 18, 2013.  The court has considered the testimony of the witnesses, the exhibits introduced during trial, and the arguments of counsel and with good cause appearing finds and concludes as follows:

FINDINGS OF FACT

    1.  During January of 2004, IGT entered into an Industrial Lease Agreement (hereinafter "Lease") with DP Industrial, LLC under the terms of which IGT leased 100,800 square feet of industrial space located at 1150 Trademark Drive, Suite 102, Reno, Nevada, from Dermody Properties.  IGT was to use the premises for storing slot machines and other related equipment and the Lease was set to expire on February 27, 2008.

    2. During May of 2005 the Lease was amended and extended through June 30, 2008 and incorporated an additional 36,000 square

1  feet of space.

2      3.   The Lease was assigned to Prologis by Dermody Properties

3  during July of 2007.

4      4.   Subsequent to the assignment of the Lease to Prologis, IGT

5  and Prologis entered into negotiations to extend the Lease.   The

6  extension was incorporated in a Second Amendment to the Lease

7  (hereafter "Second Amendment").   Robert Stecker negotiated on

8  behalf of IGT and Travis Durfee negotiated on behalf of Prologis.

9      5.   The relevant portion of the Second Amendment related to an

10 early termination option.   IGT proposed that the Lease contain an

11 early termination option along with an extension of the term of the

12 Lease for an additional five years.   IGT proposed the extended term

13 in order to obtain a lower rental rate.   Mr. Stecker proposed the

14 early termination option and requested that it be included in the

15 Second Amendment.   The evidence established that IGT wanted the

16 early termination option so it would have the ability to move out

17 early in the event it was able to secure space at another location

18 where IGT had existing facilities.   This was an important provision

19 to IGT.   Prologis was reluctant to have the early termination

20 included in the Lease but ultimately agreed to the extension and

21 the early termination provision.   The relevant language is as

22 follows:

23         "Provided no event of default shall then exist and no
           condition  shall then exist which with the passage of time or
24         giving of notice or both would constitute an event of default,
           Tenants shall have the right at any time on or before May 1,
25         2010, to send Landlord written notice (the "Termination

26                                    2

Notice") that Tenant has elected to terminate this lease effective on June 30, 2010.

If Tenant elects to terminate this Lease pursuant to the immediately preceding sentence, the effectiveness of such termination shall be conditioned upon Tenant paying to Landlord $370,560 contemporaneously with Tenant's delivery of the Termination Notice to Landlord. Such amount is consideration for Tenant's option to terminate and shall not be applied to rent or any other obligation of Tenant. Landlord and Tenant shall be relieved of all obligations accruing under this Lease after the effective date of such termination but not any obligations under the Lease prior to the effective date of such termination." (Trial Exhibit 6).

6. Both Prologis and IGT are large sophisticated corporations with legal departments. The Second Amendment was adopted after it was reviewed by Prologis' legal department and IGT's legal department. Mr. Stecker was aware of the terms of the early termination provision including the obligation to send such notice in writing and contemporaneously paying the $370,560.00 because he was involved in drafting the provision and specifically requested the provision on behalf of IGT.

7. The Second Amendment to the Lease was adopted on June 9, 2008.

8. The Lease during all relevant times expressly contained a provision that "time is of the essence of each term and provision of this Lease." This is contained in Section 38.04 of the original Lease. The termination option described above was subject to the "time is of the essence" provision.

9. IGT's representative, in all of these negotiations as to all matters involving the construction and implementation of the

3

1   terms of the Lease and the Second Amendment, was Mr. Stecker. He

2   was fully aware that under the terms of the Lease the notice and

3   payment were due on or before May 1, 2010 and the notice had to be

4   given in writing and time was of the essence.

5       10.   During February or March of 2010, Mr. Stecker contacted

6   Mr. Durfee and verbally advised him that IGT was going to elect to

7   terminate the Lease effective on June 30, 2010.  While Mr. Stecker

8   offered to tender the written termination notice he was not

9   prepared on behalf of IGT to send the $370,560.00 termination

10  payment along with the termination notice at that time.   Mr.

11  Stecker testified that he was not prepared to tender the

12  termination fee as IGT did not wish to make the payment until

13  closer to the May 1, 2010 date.  The court is persuaded from the

14  evidence that IGT made a deliberate decision to hold the early

15  termination notice and the payment so that it could collect

16  additional interest on the money.

17      11.   Mr. Durfee, on behalf of Prologis, after receiving the

18  verbal communication from Mr. Stecker advised Brandon Page,

19  Prologis' Market Officer, that IGT was planning to exercise its

20  termination rights.  Mr. Durfee also advised Mr. Stecker that he

21  should not send the written termination notice until he was

22  prepared to tender the payment as required by the terms of the

23  Lease as amended.

24      12.   As a consequence of the verbal representation that IGT

25  planned to vacate the premises within a few months, Mr. Page

26                                      4

1    directed the property manager to send a standard move-out form

2    letter to IGT. This was accomplished on March 11, 2010. This is

3    the same move-out letter which Prologis sends to every tenant prior

4    to the end of a lease. The court specifically finds and concludes

5    that this form letter did not constitute any acknowledgment or

6    acquiescence or agreement by IGT that a verbal notice of IGT's

7    intention to exercise its early termination option would replace

8    the requirement of a written termination notice together with the

9    early termination payment.

10        13. It is clear that by early March, 2010, IGT had made the

11   decision that it was going to terminate the Lease early and was

12   committed to terminating the Lease regardless of any actions taken

13   by Prologis. Edwin Strickland was designated by IGT to manage all

14   aspects of the construction and demolition work that would be

15   required by IGT to leave the Prologis property. He worked with

16   Prologis employees in the Spring of 2010 to prepare demolition

17   plans for the tenant improvements that IGT had made to the Prologis

18   property.

19        14. On March 11, 2010, Prologis' Property Manager Alisa Weber

20   sent IGT a pending move-out checklist. One of the things the move-

21   out checklist provided for was a preliminary inspection of the

22   property. It also provided IGT with a number of tasks that were

23   going to be required to be performed in advance of the Lease

24   expiration date including making various repairs to the property

25   and turning over the keys to the property to Prologis.

26                                        5

1    15.   Prior to May 12, 2010, IGT and Prologis participated in
2    two inspections of the premises in anticipation of the move-out.
3    The termination notice was not discussed during the inspections.
4    Prologis had an obligation under the terms of the Lease to
5    facilitate IGT's move-out and re-letting of the premises and
6    Prologis' participation in the move-out discussions were strictly
7    pursuant to the non-binding oral indications by IGT that it
8    intended to vacate the premises early.

9    16.   On April 22, 2010, IGT provided Prologis with its tenant
10   improvement drawings of the offices IGT constructed at the leased
11   premises.

12   17.   Through no fault of Prologis, IGT negligently failed to
13   provide Prologis with the written notice of termination or with the
14   $370,560.00 specified in the Second Amendment to the Lease on or
15   before May 1, 2010.

16   18.   On May 5, 2010, Prologis returned the drawings to IGT
17   along with a tentative demolition plan.  At that time, Prologis was
18   unaware that IGT had failed to tender its written termination
19   notice or the termination fee on or before May 1, 2010 as required
20   for early termination under the terms of the Lease.

21   19.   It was not until May 11, 2010, that Mr. Stecker, on
22   behalf of IGT, realized he had missed the May 1, 2010 deadline
23   because he had "forgotten the date".  He testified that it was a
24   mistake on his part to fail to comply with the express terms of the
25   Lease and tender the money and the written notification of

26

1  termination.

2      20.   Mr. Stecker notified Mr. Durfee that he had made a

3  mistake in not complying with the deadline for early termination in

4  accordance with the terms of the Lease.  He did so after he had

5  spoken with his supervisor, Mr. Ciorciari.

6      21.   When Mr. Stecker spoke with Mr. Durfee about the failure

7  to execute the early termination in accordance with the Lease he

8  advised Mr. Durfee that IGT would send the payment and written

9  notice to Prologis the following day.  Mr. Durfee indicated to Mr.

10 Stecker that while he was surprised at the missed deadline he

11 needed to confer with his superiors and that Mr. Stecker should not

12 deliver the written notice and payment until he had an opportunity

13 to review the Lease and consult with management.

14     22.   On May 12, 2010, Mr. Stecker prepared a letter to

15 Prologis in which he stated that the letter represented "formal

16 notification" that IGT was exercising its early termination option.

17 Mr. Stecker intended that this letter be the written notification

18 under the Second Amendment as no previous written termination

19 notification had been given by IGT to Prologis.  That letter was

20 never sent to Prologis.  Instead on May 12, 2010, Mr. Strickland e-

21 mailed Mr. Durfee seeking direction on certain demolition issues in

22 an effort to keep the demolition work on schedule and "as painless

23 as possible."

24     23.   Mr. Stecker sent Mr. Durfee an e-mail on May 14, 2010

25 offering to have IGT's written notice and payment delivered to

26                                   7

1   Prologis until Prologis could come to a decision. Mr. Durfee

2   advised Mr. Stecker to hold the notice and payment because he could

3   not accept them until a decision had been made by Prologis'

4   management.

5        24.   Mr. Stecker acknowledged that he had not calendared the

6   deadline and he did not know of anyone else within the IGT

7   organization who had calendared the deadline for giving written

8   notification and the payment pursuant to the terms of the Lease.

9        25.   The evidence showed that Mr. Stecker had signed copies of

10  the Lease as did IGT's legal department and compliance department.

11  The testimony established that IGT did not have a routine procedure

12  or methodology for calendaring deadline dates like the termination

13  notice contained in the Lease.

14       26.   At no time did any representative of Prologis ever lead

15  Mr. Stecker to believe that he did not need to send a formal

16  written termination notice in accordance with the terms of the

17  Lease. And, at no time did any representative of Prologis ever

18  lead Mr. Stecker to believe that he was not required to tender the

19  payment in the amount required under the Lease prior to the May 1,

20  2010 deadline.

21       27.   On May 19, 2010, IGT's legal department prepared a letter

22  which was hand-delivered to Prologis on May 19, 2010 providing

23  written notification of IGT's desire to terminate the Lease.

24       28.   While the letter uses the language "previous notices" of

25  termination, the evidence is clear that the only notification was

26                                    8

1    a verbal notification substantially in advance of the May 1, 2010
2    deadline without compliance with the written requirements of
3    notification and the tender of payment for the amount required for
4    early termination.

5        29.  On May 24, 2010, Mr. Strickland called Mr. Durfee about
6    the demolition.  At that point in time IGT clearly intended to
7    vacate the premises regardless of what Prologis did or did not do
8    in connection with the move-out of IGT.  IGT had already prepared
9    office space and warehouse space on its own premises and intended
10   to vacate the premises notwithstanding the dispute involving the
11   early termination provisions of the Lease.

12       30.  On May 24, 2010, Mr. Durfee advised IGT that Prologis was
13   not accepting IGT's late termination and was not required to give
14   any direction to proceed with demolition and move-out of IGT as
15   Prologis determined that IGT had not exercised its early
16   termination right in accordance with the provisions of the Lease.
17   IGT was advised by Prologis that it might want to leave the space
18   as-is in case a sub-tenant could use the additional tenant
19   improvements.  Although this is disputed, the court is persuaded
20   that Mr. Strickland advised Prologis that IGT would proceed with
21   demolition of all the tenant improvements unless Prologis consulted
22   with IGT in connection with the move-out.  This finding is
23   consistent with the fact that IGT intended to vacate the premises
24   notwithstanding its negligent conduct in failing to timely exercise
25   the early termination option.

26                                      9

31.  Prologis then proceeded to assist IGT in connection with the move-out but did so after expressly indicating that it was not waiving its rights under the terms of the Lease and that Prologis would continue to enforce its rights under the terms of the Lease.

32.  Although IGT clearly understood that Prologis continued to assert that IGT was not properly vacating the premises and had not complied with the terms for early termination, IGT nevertheless proceeded to take the necessary steps to vacate the premises.

33. On May 25, 2010, Prologis sent a letter to IGT returning the check reflecting the payment to IGT and IGT received the check on May 26, 2010.  The letter stated that "IGT did not properly exercise its termination option" and "the Lease remains in place."

34. On May 27, 2010, Prologis sent IGT an e-mail stating that "Section 42.01 of the First Amendment to Lease, at termination, allows Landlord, at its election, to require IGT to remove all of the Tenant Improvement finished office space at IGT's expense." In that letter, Prologis advised IGT "that the Lease between the two parties has not been terminated, so landlord is not legally required at this time to make any election as to the removal of tenant improvements."

35. Nevertheless, Prologis continued to attempt to accommodate IGT in the move-out and assist in preparing the premises for re-letting.

36.  The court finds and concludes that these actions of Prologis were undertaken in an effort to mitigate any potential

10

damages because IGT intended to vacate the premises notwithstanding the notifications by Prologis that IGT had failed to comply with the Lease and was legally bound for the remaining term of the Lease. Prologis then proceeded to identify those improvements which it desired to have remain on the premises.   Again, Prologis expressly reserved all of its rights under the Lease.

37.   On May 27, 2010, in its e-mail, Prologis stated "both this e-mail and Prologis' demolition suggestions shall in no way be construed as a waiver of any of landlords legal and contractual rights under the Lease Agreement . . . "

38.   There is no doubt in the court's mind that IGT and its representatives fully understood that at the time they were vacating the premises in late May, 2010, Prologis reserved all of its rights under the terms of the Lease.

39.   IGT then proceeded with its demolition work starting on June 7, 2010 and completed the work on June 23, 2010.

40.   IGT paid $97,152.00 to demolish its tenant improvements. Even if IGT had occupied the premises for the remainder of the Lease it would have had this obligation to remove the tenant improvements.

41. On June 23, 2010, IGT requested a final inspection to confirm that no construction issues remained.

42.   During the period May 1st to May 26th, 2010, IGT completed a substantial portion of the move of its warehouse property from the Prologis space to IGT's campus on Prototype

11

1   Drive.

2        43.  At that point in time Prologis reasonably determined that

3   regardless of what it did or did not do, IGT intended to vacate the

4   premises and move all of its operations to its facility on IGT's

5   campus.  The demolition work on the premises was reasonably

6   undertaken by both Prologis and IGT in order to mitigate damages in

7   response to IGT's insistence on leaving the property in breach of

8   the Lease even though it had not complied with the provisions of

9   the Lease for early termination.

10       44.  On June 24, 2010, Prologis participated in the final

11  inspection of the premises and IGT left the premises on or before

12  June  30, 2010, on which date IGT changed the locks and IGT no

13  longer had access to the building.

14       45.  Thereafter IGT failed and refused to pay any rent or

15  other payments as they came due under the terms of the Lease

16  commencing July 1, 2010 and continuing until June 30, 2013, the

17  termination date of the Lease.

18       46. On July 14, 2010, Prologis initiated a summary eviction

19  action under the provisions of Chapter 40 of the Nevada Revised

20  Statutes for IGT's non-payment of the July rent.  IGT filed a

21  tenant affidavit on July 21, 2010, contesting Prologis' eviction

22  notice.  IGT had no intention of possessing the premises and

23  Prologis re-entered the premises and attempted to secure a

24  replacement tenant.  The eviction action was then dismissed by

25  Prologis.

26                                  12

47.   On December 6, 2010, Prologis was able to secure a replacement tenant, Laco, Inc., for 36,000 square feet of the premises vacated by IGT.

48.   Prologis then continued to attempt to re-let the balance of the premises.  In so doing, Prologis advertised the listing on LoopNet, which is an on-line listing service for commercial and industrial properties, and in brochure materials which were mailed to parties who made inquiries. Prologis also communicated with various brokers, discussed the premises by word-of-mouth, and posted a generic "notice of property available for lease" on Prologis' property. Prologis also received and considered proposals from potential tenants and prepared counter proposals.  Prologis provided IGT with the names of brokers who could assist in locating possible sub-tenants and attempted to accommodate any request by IGT to conduct tours of the premises with potential sub-tenants.

49.   Prologis was unable to secure a replacement tenant for the balance of the property.

50.   IGT did not undertake any efforts to find a replacement tenant after it left the property on June 1, 2010.

51.   Prologis has suffered damages as a result of IGT's failure to comply with the terms of the Lease and is entitled to recover those damages in accordance with the terms of the Lease. Those damages, as of November 18, 2013, amounted to $2,531,299.00 after credit is given for IGT's security deposit, and the rent and other charges received from Laco.  This sum represents unpaid base

13

1   rent in the amount of $1,844,160.00, operating costs in the amount

2   of $413,312.00 (this represents a 10% reduction as a result of

3   testimony that created some ambiguity as to actual costs), system

4   replacement fees in the amount of $64,022.00, accrued interest in

5   the amount of $566,204.00, the TI allowance for Laco in the amount

6   of $38,362.00; brokerage commission for Laco in the amount of

7   $19,972.00 (the sum of $9,836.00 paid to in-house brokers has been

8   deducted).  No allowance has been made for the repairs that were

9   not made and IGT has been given credit for the deposit in the

10   amount of $40,911.00.  Interest will accrue at the contract amount

11   from November 18, 2013 until the date of judgment and thereafter at

12   the rate provided by law.  The contract also provides for the

13   prevailing party to recover attorneys' fees and costs.

**CONCLUSIONS OF LAW**

15     1.  Prologis is a corporation organized under the laws of

16   Delaware and has its principal place of business in Colorado.

17     2.  IGT is a corporation organized under the laws of the State

18   of Nevada and has its principal place of business in Nevada.

19     3.  This court has jurisdiction pursuant to 28 U.S.C. § 1332

20   and venue properly lies in the district of Nevada.

21     4.  The lease entered into by Prologis and IGT specifically

22   provides that it is to be governed by and construed in accordance

23   with the laws of the State of Nevada.

24     5.  Because the court is exercising diversity jurisdiction,

25   Nevada substantive law governs this action.  Erie R.R. Co. v.

14

1  Thompkins, 304 U.S. 64, 78 (1938); Nitco Holding Corp. V.

2  Boujikian, 491 F.3d 1086, 1089 (9th Cir. 2007).

3      6.  In determining the intent of the parties the court looks

4  to the plain language of the contract.  If the contract is clear

5  the court will enforce the provisions even if the application of

6  those conditions seems harsh or unfair.  Cummings v. Bullock, 367

7  F.2d 182, 186 (9th Cir. 1966).

8      7.  The dispute that resulted in this litigation involves the

9  failure of IGT to comply with the early termination provision

10 contained in the Lease.  That provision states:

11         Tenant shall have the right at any time on or before
           May 1, 2010 to send Landlord written notice (the "Termination
12         Notice") that Tenant has elected to terminate this Lease
           effective on June 30, 2010.

13
           If Tenant elects to terminate this Lease pursuant to the
14         immediately preceding sentence, the effectiveness of such
           termination shall be conditioned upon Tenant paying to
15         Landlord $370,560.00 contemporaneously with Tenant's delivery
           of the Termination Notice to Landlord. (Trial Exhibit 6).

16 8.  In addition the Lease explicitly provided in Section 38.04

17 that time is of the essence in the performance of its terms.

18 Therefore, IGT was required to provide Prologis with written notice

19 of its intention to exercise its early termination option,

20 contemporaneously with payment in the amount of $370,560.00 on or

21 before May 1, 2010.

22     9.  It is undisputed that IGT did not deliver its written

23 Termination Notice and payment to Prologis on May 1, 2010.  Under

24 the express terms of the contract IGT failed to comply with the

25

26                                    15

1  terms of its early termination option.  Because IGT failed to

2  exercise its right in a timely manner it lost its right to

3  terminate the Lease early and therefore IGT's lease obligations

4  continued through the end of the stated lease term, that is June

5  30, 2013.

6      10.  If a lease option provides a tenant with a unilateral

7  option and time is of the essence in such an option contract the

8  tenant is required to strictly comply with the terms of the option.

9  G.S. Johnson Co. v. Nevada Packard Mines Co., 272 F. at 291, 296

10  (D.Nev. 1920); McCall v. Carson, 172 P.2d 171, 185 (Nev. 1946).

11  Substantial compliance is not sufficient.  White v. Miller, 518 S.

12  W. 2d 383, 385 (Tex. Ct. App. 1974) (timely verbal notice

13  insufficient where option required written notice).  Exact

14  compliance with an option contract's terms is stringently enforced.

15  Cummings v. Bullock, 367 F.2d 182, 186 (9th Cir. 1966).  In

16  discussing the substantial compliance doctrine the Nevada Supreme

17  Court has held as follows:

18      The optionor, before acceptance by the optionee, is bound
        only to the extent that he has expressly agreed to be bound.
19      The obligation on his part is a mere offer, requiring
        unconditional acceptance in order that a contract may be
20      created.  If it were construed otherwise, an optionee could
        change the time specified for the payment of money, or impose
21      conditions not contemplated by the parties at the time the
        agreement was entered into, and thereby, without the
22      optionor's consent, foist a so-called contract upon him to
        which he had not agreed.  Fundamentally, the law of contracts
23      does not permit this, as there must be mutuality of consent to
        all the provisions – a meeting of the minds – in order that a
24      contract may be created.

25  McCall, 172 P.2d at 185; see also Cummings, 367 F.2d at 186.

26                                    16

1    11.   These same rules apply to early termination options in
2    commercial leases.   Loitherstein v. IBM, 413 N.E.2d 1146 (Mass.
3    App. Ct. 1980) (where sophisticated parties carefully chose clear
4    option language, landlord properly rejected tenant's attempted
5    early termination where notice of termination was 23 days early,
6    but termination fee was 5 days late).

7    12.   Here both Prologis and IGT are sophisticated parties.
8    They both have legal departments.   The early termination provision
9    was added to the Lease for the benefit of IGT and IGT clearly
10   understood its legal obligations to exercise the early termination
11   provision in writing with a simultaneous payment of $370,560.00.

12   13.   While IGT seeks equitable relief from the court for
13   missing the option deadline, Nevada law does not permit such relief
14   under the circumstances of this case.   The Nevada Supreme Court has
15   held that equity will not intervene to protect a lessee from its
16   own negligent failure to give the required written option notice.
17   Host International, Inc. v. Summa Corp., 583 P.2d 1080 (Nev. 1978).
18   See also Holmby, Inc. v. Dino, 647 P.2d 392, 393-94 (Nev. 1982).

19   14.   The language of the termination option is clear and
20   unambiguous.   IGT was entitled to terminate the Lease only if it
21   provided written notice of its election on or before May 1, 2010
22   and contemporaneously with the written termination notice tendered
23   the termination fee of $370,560.00 to Prologis.   Early verbal
24   notification of the termination was insufficient as a matter of law
25   to exercise the early termination provision.   In addition, it is

26                                   17

1  clear that the fault for failing to give the notice was clearly

2  IGT's negligence and the motivation for not tendering the

3  $370,560.00 was IGT's business decision to retain the funds so they

4  could draw interest beneficial to IGT.

5      15.  Equity will not intervene to protect the lessee from its

6  own negligent failure to give the required written notice.  Host,

7  583 P.2d at 1082.  Therefore, IGT's argument of substantial

8  compliance is unavailing under the facts of this case.

9      16. As an affirmative defense IGT argues that Prologis waived

10 its right to enforce the early termination provision under the

11 Lease.  IGT bears the burden of proving an existing right, a

12 knowledge of its existence, and an actual intention to relinquish

13 it or conduct so inconsistent with the intent to enforce the right

14 as to induce a reasonable belief that it has been relinquished.

15 Baroi v. Platinum Condo Development, LLC, No. 2:09-cv-00671, 2012

16 U.S. Dist LEXIS (D. Nev., 2012). Further, a waiver is not effective

17 unless done with full knowledge of all its material facts.  In

18 addition, to prove waiver by conduct, which is the theory advanced

19 by IGT, Prologis' conduct must be so manifestly consistent with an

20 intent to relinquish voluntarily a particular right that no other

21 reasonable explanation of one's conduct is possible.  In re Spats

22 Restaurant & Saloon, 64 B.R. 442, 446 (Bankr. D. Nev. 1986).

23     17.  The court concludes that Prologis did not waive strict

24 compliance with the Second Amendment to the Lease when Mr. Durfee

25 advised Mr. Stecker in March of 2010 that he should not send the

26                              18

termination notice until he also sent the termination fee precisely in accordance with the clear language of the Second Amendment. This unequivocally established that Prologis was insisting on strict compliance with the terms of the option.  Therefore, Mr. Stecker's March 2010 verbal inquiry was not a proper exercise of the termination option.  The verbal inquiry was legally insufficient to satisfy the requirements of the early termination option.

18.  In addition, the court concludes that Prologis did not intend to nor did it ever waive strict compliance with the terms of the option when it conducted inspections of the premises, provided demolition instructions to IGT and commenced efforts to market the premises prior to May 1, 2010.  Prior to that date and because of IGT's verbal indication that it expected to exercise its option for early termination, Prologis had a reasonable expectation that IGT would eventually, prior to May 1, 2010, provide the timely termination option and payment in accordance with the provisions of the Lease.  The conduct of Prologis prior to the May 1, 2010 deadline was consistent with reasonable business practices to prepare for the termination in the event compliance with the written termination was provided by IGT.  Such conduct did not constitute an intention to waive rights nor did it induce a reasonable belief in IGT that Prologis was waiving its right to require strict compliance with the early termination provisions of the Lease.

19.   In addition, the court concludes that when Prologis returned the tentative demolition plans to IGT on May 5, 2010 and conducted the inspection on May 7, 2010, after the May 1, 2010 deadline, such conduct was undertaken as a result of the mistaken belief by Prologis that IGT had complied with the written notice requirements. Prologis as a commercial landlord had no legal obligation to notify IGT of the pending or missed option deadline. See Warminster Equities, LLC. Warminster Commerce, LLC, No. 11-3238, 2012 U.S. App. LEXIS 19645 (3d Cir. Sept 19, 2012). There was no requirement in the Lease that Prologis had any duty to notify IGT of noncompliance with the early termination provisions or the payment of the termination fee. The court concludes that these actions of Prologis were not intended as a waiver of any of Prologis' rights under the Lease in relation IGT's early termination option.  The court concludes that this conduct did not constitute an express or implied waiver and does not warrant equitable relief.

20.   The conduct of Prologis in late May of 2010 in providing IGT with direction on what tenant improvements to leave on the premises, inspecting the premises and providing input on the demolition work did not constitute a waiver.  IGT made it very clear to Prologis, even though it missed the May 1, 2010 deadline for exercising the early termination, that it intended to vacate the premises and abandon the Lease because it had constructed facilities on its own campus and that it was therefore going to

move regardless of Prologis' conduct.  IGT clearly understood from

both written and verbal communications by Prologis that Prologis

intended  to  enforce  its  rights  under  the  express  terms  of  the

Lease.   Under  such  circumstances  it  was  not  unreasonable  for

Prologis to work with IGT in restoring the premises to a condition

where Prologis would be able to make reasonable efforts to re-let

the  premises  to  another  tenant  once  IGT  vacated  the  property.

Prologis  had  a  reasonable  concern  that  if  it  did  not  provide

direction to IGT, IGT would simply remove all of the improvements

and  leave  the  premises  in  a  condition  that  would  make  it  more

difficult  for  Prologis  to  attempt  to  mitigate  its  damages  by  re-

letting the property.  Prologis had an obligation under the Lease

to  act  in  good  faith  in  cooperating  with  IGT  and  had  a  further

obligation to undertake a reasonable good faith effort to mitigate

its  damages  under  both  the  provisions  of  the  Lease  and  the

provisions of NRS 118.175.

21.  Under  the  facts  presented  during  the  trial  the  court  is

persuaded that it was IGT, not Prologis, who insisted on the move-

out and on demolition direction from Prologis, because IGT intended

to  vacate  the  premises  even  though  it  had  negligently  failed  to

comply with the provisions of the early termination section of the

Lease.

22.  For  these  reasons,  the  court  specifically  finds  and

concludes that the evidence established that Prologis' post-May 1,

2010 conduct does not support a finding of waiver, either express

or implied.  Prologis cooperated with IGT in connection with the demolition work in order to mitigate its damages by helping to restore the facility to a condition that would maximize the marketability of the property and enhance the prospect of securing new tenants once the property was vacated by IGT.  The Lease provides that nothing undertaken by Prologis to mitigate damages shall waive Prologis' right to recover damages against IGT. Sections 20.01 and 20.03.  It further provides that "whether the premises or any part thereof is a re-let" IGT shall remain liable under the Lease.  Section 20.03 (B).  Here Prologis had a duty to make reasonable efforts to re-let once it understood that IGT was going to vacate the premises even though it had been advised not to do so because of the failure to comply with the early termination provision. The remodeling and re-letting efforts did not constitute a waiver of Prologis' rights to reject the late tender by IGT of the payment and written termination notice.  Accordingly, the court concludes there was no express or implied waiver of the early termination provisions of the Lease by Prologis during any of its pre- or post-May 1, 2010 conduct.  At all times Prologis reserved its rights under the Lease and expressly disclaimed an intention to waive any rights in all of its communications with IGT.  Nor did Prologis' conduct for the reasons set forth above support IGT's defense of estoppel, breach of the covenant of good faith and fair dealing, or surrender and acceptance.  Therefore the court concludes that IGT has failed to meet its burden in establishing an

1  entitlement to recover on its defenses of substantial performance,

2  waiver, estoppel, breach of the covenant of good faith and fair

3  dealing, and surrender and acceptance.

4      23. Finally the court concludes that Prologis used reasonable

5  efforts to mitigate its damages. Prologis was able to secure a

6  replacement tenant (Laco) for a portion of the premises within

7  approximately six months of IGT's abandonment of the property. The

8  only evidence provided at trial relating to the reasonableness of

9  Prologis' mitigation efforts was evidence provided by Prologis.

10 IGT offered no evidence, such as expert testimony, that the efforts

11 of Prologis in attempting to secure new tenants fell below the

12 standard of reasonableness. IGT had an obligation to show that

13 Prologis' mitigation efforts were unreasonable. The efforts

14 undertaken by Prologis to re-let the premises included listing the

15 premises on the commercial MLS service, providing mass e-mailings

16 to local brokers, using in-house brokers, and submitting brochures

17 and erecting business park signage. Those were the usual and

18 customary steps Prologis took on a regular basis to lease its other

19 properties. These were reasonable and customary steps in the

20 commercial marketplace. Therefore, the court concludes that

21 Prologis took reasonable mitigation steps in an effort to re-let

22 the premises after the premises were vacated by IGT. While it

23 might have been preferable to hire an outside broker, there is no

24 indication in the record that doing so would have assisted in the

25 re-letting of the premises, particularly in the severely depressed

26                                23

1   commercial real estate market that existed at the time. In

2   addition, the fact that Prologis was able to secure a new tenant

3   for a portion of the property provides further support for the

4   conclusion that Prologis used reasonable efforts to re-let the

5   premises.

6       24.  On the issue of damages the court finds and concludes

7   that Prologis is entitled to recover damages against IGT as set

8   forth in the Lease from the time that IGT left the premises until

9   the expiration of the Lease on June 30, 2013.

10      25.  The court finds that IGT's failure to properly exercise

11  its termination option resulted in the Lease continuing through

12  June 30, 2013.  IGT continued to owe rent under the terms of the

13  Lease and was otherwise obligated to comply with the terms of the

14  Lease through the end of the term on June 30, 2013.  Therefore,

15  Prologis is entitled to a declaratory judgment that IGT failed to

16  comply with the required conditions for exercising its termination

17  option and therefore the option was not properly exercised; that

18  the Lease continued as a valid and enforceable contract on and

19  after July 1, 2010 such that IGT continued to owe the rentals and

20  other charges under the Lease through June 30, 2013.  The total sum

21  owed under the terms of the Lease by IGT to Prologis through the

22  end of the Lease term was in the amount of $2,531,299.00.  (See

23  Paragraph 52 of the court's Findings of Fact).

24      26.  The court also finds and concludes that IGT breached the

25  Lease by failing to properly exercise the early termination

26                              24

1  provision and by failing to pay the rent and other charges after

2  July 1, 2010.   The Lease obligated IGT to pay all rent and

3  obligations in a timely manner.  IGT failed to pay any rent or

4  other charges after July 1, 2010.

5      27.  Prologis properly notified IGT of its breach and IGT

6  refused to take any corrective action.

7      28.  Prologis performed all of its obligations and satisfied

8  all of its conditions under the Lease.

9      29.  Prologis made reasonable efforts to mitigate its damages

10  once IGT left the premises.

11      30.  IGT has failed to carry its burden on any of its defenses

12  to Prologis' claims.

13      31.  As a consequence of IGT's breach of the Lease, Prologis

14  suffered damages and is entitled to an award of damages for breach

15  of contract in the amount of $2,531,299.00 (reflecting damages

16  through November 18, 2013).  These damages shall bear interest in

17  the contract amount from November 18, 2013 until the date of entry

18  of judgment and thereafter at the rate provided by law.[1] (See

19  ─────────────────

20      [1]As a general rule, in diversity actions, state law determines
   the rate of prejudgment interest and post-judgment interest is

21  governed by federal law.  Citicorp Real Estate, Inc. v. Smith, 155 F3d
   1097 (9th Cir. 1998).  See 28 U.S.C. § 1961.  An exception to § 1961
   exists when the parties contractually agree to waive its application.

22  Fid. Fed. Bank, FSB v. Durga Ma Corp., 387 F3d 1021, 1023 (9th Cir.
   2004).  Here the Lease does not include a provision reflecting any

23  intent of the parties to waive the application of § 1961 to post-
   judgment awards. See Cataphora, Inc. v. Parker, 848 F.Supp. 2d 1064,

24  1074-75 (D.Nev. 2012). Therefore the federal statutory rate of
   interest shall apply post-judgment to the amount awarded.

25

26                              25

1  Paragraph 52 of the court's Findings of Fact).

2      32.  The court further concludes that Prologis is entitled to

3  an award of costs and attorneys' fees as the prevailing party in

4  accordance with the provisions of Section 22 in the Lease.

5      33.  Prologis shall submit to the court its bill of costs and

6  affidavits in support of reasonable attorneys' fees on or before

7  March 1, 2014.  The Clerk of Court will then tax costs.  Any

8  objection to the taxation of costs shall be filed within 20 days of

9  the taxation of costs by the Clerk.  Any objections to Prologis'

10 request for attorneys' fees shall be filed within 20 days after the

11 filing of Prologis' request for fees.  Should either party object

12 to the award of interest post judgment based on the legal rate

13 rather than the contract rate, such objections should be filed in

14 writing by March 1, 2014.

15     34.  The Clerk of Court shall enter a judgment consistent with

16 these Findings of Fact and Conclusions of Law and Order.

17     It is so ordered.

18     Dated this 29th day of January, 2014.

_____
Honorable Howard D. McKibben
Sr. United States District Judge

26